UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
:
PAUL S. ROTHSTEIN, COHN :
LIFLAND PEARLMAN, HERMANN & :
KNOPF, LLP, and TREIF AND OLK, :
:
Plaintiffs, :
: Civil Action No. 10-1421 (MCA)
v. :
:
RONALD M. HARSTAD, :
: FINDINGS OF FACT AND
Defendant. : CONCLUSIONS OF LAW
_____ :

**Appearances:**

Peter S. Pearlman, Esq.
Cohn Lifland Pearlman Herrmann & Knopf LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663

Ted Trief, Esq.
Trief & Olk
9 Kansas Street
Hackensack, New Jersey 07601

Paul S. Rothstein, Esq.
626 NE First Street
Gainesville, Florida 32601
   *Attorneys for Plaintiffs*


Jo Ann Burk, Esq.
D'Arcambal Ousley & Cuyler Burk, LLP
Parsippany Corporate Center
Four Century Drive
Parsippany, New Jersey 07054

Kathy D. Bailey, Esq.
Bailey Law PC
1615 L Street N.W., Suite 650
Washington, D.C. 20036
   *Attorneys for Defendant*

**ARLEO**, **UNITED STATES MAGISTRATE JUDGE**

**I.     INTRODUCTION**

Plaintiffs Paul Rothstein, Cohn Lifland Pearlman Herman & Knopf LLP, and Trief & Olk (collectively, "Plaintiffs") brought this declaratory judgment action against Defendant Ronald Harstad ("Harstad" or "Defendant") pursuant to 28 U.S.C. §§ 2201, *et seq.*  Plaintiffs hired Harstad on or about May 2006 to perform damages calculations as an expert in connection with a class action lawsuit.  A dispute arose when Harstad submitted his last two bills in December 2008, totaling $160,800, shortly after which Harstad instructed Plaintiffs to either pay him in full or not use any of his work from October 1, 2008 forward.  Plaintiffs then hired an alternate expert and now seek a declaration that Plaintiffs have no further obligation to Harstad.  Harstad, alleging that Plaintiffs accepted and benefited from his work product, counterclaims for breach of contract and unjust enrichment.  Harstad alleges that Plaintiffs owe him for all the work he performed until December 2008, including interest.

From September 19, 2013, to September 20, 2013, I presided over a non-jury trial in which the parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues, and argue the law and the evidence.

Below, I make the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) based on the competent evidence presented at trial:

**II.    FINDINGS OF FACT**[1]

1. In or about May 2006, Plaintiff Paul Rothstein, Esq. ("Rothstein") retained Harstad as an expert witness to perform damages calculations for a class action then-pending in the

---

[1] These facts incorporate the factual stipulations of the parties in the Pretrial Order and those facts agreed to at trial.

   Superior Court of New Jersey, Law Division, Somerset Count, Docket No. SOM-L-272-05, originally captioned <u>Yosef Yariv, on behalf of himself and all others similarly situated v. AT&T Corp. and Sam's Club East, Inc. and Sam's Club West, Inc.</u> (the "<u>Yariv</u> Action"). (Stip. 1, Dkt. No. 72, Jt. Pretrial Order at 2).

2. The <u>Yariv</u> Action involved claims that AT&T prepaid telephone calling cards contained an international conversion chart that misrepresented the number of minutes class members would be charged for international calls. (Stip. 2, Jt. Pretrial Order at 2). Harstad's damages calculations were to reflect how much more these class members spent on international phone calls than had been advertised. (Harstad at 10).[2]

3. On or about May 22, 2006, Harstad forwarded a letter (the "May 22 letter") to Rothstein outlining their arrangement. (Stip. 3, Jt. Pretrial Order at 2).

4. Harstad acknowledged receipt of the case acceptance fee of $3,000. (Harstad at 10). The May 22 letter then provided as follows: "Compensation for time: the $600/hour fee is in addition to compensation for expenses. I [Harstad] will provide monthly logs, for any month when I spent time on this cause, showing the amount of time spent each day, with a rough summary of how that time was spent." (Stip. 4, Jt. Pretrial Order at 2-3).

5. The May 22 letter also provided that Harstad would use graduate and undergraduate students to perform services when feasible at rates of $50 and $15 per hour, respectively. (Stip. 5, Jt. Pretrial Order at 3). Graduate and undergraduate students were to be used "when it would save [Plaintiffs] money." (Harstad at 10). Harstad stated "that $1,000 be budgeted initially for the graduate student, and $600 for the undergraduate student; if

---

[2] References to the trial transcript are indicated by the name of the witness and transcript page number. All citations to Dr. Harstad's testimony are from the September 19, 2013 transcript, while all other citations are from the September 20, 2013 transcript.

these limits are being reached I [Harstad] will discuss with you [Rothstein] what to do further." (Defendant's Trial Exhibit ["Def. Ex."] 9).

6. In the May 22 letter, Harstad represented he would "make efforts to keep expenses reasonable[.]" (Def. Ex. 9).

7. The May 22 letter further provided that payments were to be made as follows: one-third due within three months of being invoiced interest free; an additional one-third due within eight months of being invoiced with interest accruing at 1.5% a month after the third month until paid; and the remainder, including all unpaid amounts, to be settled within two months of the resolution of the case, whatever that resolution may be. Out of pocket expenses were to be paid within 20 days of invoicing. (Stip. 6, Jt. Pretrial Order at 3).

8. In June 2006, Rothstein contracted with Cohn Lifland Pearlman & Knoph and Trief & Olk to join as co-counsel in the Yariv Action and so informed Harstad. (Stip. 7, Pretrial Order at 3).

9. On July 10, 2006, Harstad and Rothstein agreed to modify the terms of the May 22 letter to reduce the interest rate of 1.5% per month on the final one-third of the time charges to 0.75% per month and delaying the application of interest on the final one-third of the time charges until 6 months after the charges had been billed if the first one-third and second one-third were paid as agreed. (Stip. 8, Pretrial Order at 3-4).

10. Harstad stipulated that he does not and will not seek compound interest. (Stip. 24, Jt. Pretrial Order at 6).

11. During the course of the Yariv Action, Plaintiffs provided Harstad with data obtained from AT&T and Sam's Club regarding the usage of AT&T prepaid calling cards.

    Plaintiffs requested that Harstad analyze this data, develop a methodology to calculate damages in the future, and calculate damages from this data for use in the <u>Yariv</u> Action. (Stip. 9, Jt. Pretrial Order at 4). Harstad testified that he was assigned "two basic steps" which were "to prepare the brief for certification of the class" and "to come up with an estimate of damages." (Harstad at 13). Harstad further testified that he had "all the data" by April 2008. (Harstad at 19).

12. Plaintiffs rejected Harstad's initial methodology. (Harstad at 22). In an April 9, 2008, email, Peter Pearlman, Esq. ("Pearlman") requested information from Harstad regarding "methodology and cost before we plunge into a global analysis." (Def. Ex. 23).

13. Cost estimates were mainly discussed by telephone. The parties often memorialized or otherwise referenced their understandings in emails to one another. In an April 29, 2008 email, Rothstein wrote to Harstad that Harstad had "estimated that the cost of making this calculation [of the minute-based damages for the class period] would be between $10,000 and $12,000." (Def. Ex. 24). Though Harstad testified that he had "no recollection of having made that or any other estimate," (Harstad at 28), in a phone call with Plaintiffs, Harstad did provide an estimate of $15,000-$18,000 upon being "pressed" for an estimate by Rothstein. (Harstad at 143-144; <u>see also</u> Harstad at 151-153, 158). Though the parties dispute what this estimate was meant to represent, the Court finds the testimony of Rothstein, Pearlman and Ted Trief, Esq. ("Trief") persuasive that: (a) the estimate of $15,000-$18,000 was to represent the cost of Harstad's primary task of computing a damages estimate; (b) Plaintiffs obtained this estimate no later than September 19, 2008; and (c) Plaintiffs relied on this estimate when proceeding with Harstad. (Rothstein at 6-8; Pearlman at 43-47; Trief at 53-59; <u>see also</u> Harstad at 165-66).

14. Indeed, in July 2008 and September 2008, Harstad twice notified Plaintiffs that certain obstacles were going to add $2,500-$3,100 to the project's cost. (Def. Ex. 30; Def. Ex. 35).

15. Harstad did not submit invoices for October 2008 and November 2008 until December 21, 2008, when he sent Plaintiffs an invoice for $110,700. (Stip. 11, Jt. Pretrial Order at 4). Subsequently, on December 29, 2008, Harstad sent Plaintiffs the December 2008 invoice, which totaled $50,100. (Stip. 12, Jt. Pretrial Order at 4). At this point, Harstad had already received a total of $164,604.79 from Plaintiffs. (Harstad at 122).

16. At no point prior to sending the December 21, 2008 and December 29, 2008 invoices did Harstad notify Plaintiffs as to the amounts of either invoice, including the amount of fees and costs that had been incurred during those months. (Stip. 14, Jt. Pretrial Order at 4).

17. In December 2008 and January 2009, a dispute arose over Harstad's billing for October through December 2008. (Stip. 13, Jt. Pretrial Order at 4). In heated phone calls, Rothstein and Harstad argued over the amount charged on these invoices. (Rothstein at 35).

18. In a January 14, 2009, letter to Harstad, Plaintiffs objected to Harstad's October through December 2008 bills totaling over $160,000. (Stip. 15, Jt. Pretrial Order at 5).

19. On January 24, 2009, Harstad sent a response to Plaintiffs instructing them not to "communicate to the court, defendants or defense counsel any of the reports, findings, numbers, or analysis that [he had] provided since October 1, 2008," unless Plaintiffs paid the full amount of his invoices for those months, with $118,746.53 due immediately. (Def. Ex. 97). The amount of fees claimed in this letter did not comply with the terms outlined in his May 22 letter. (Harstad at 189).

20. Plaintiffs chose to reject Hardstad's work. (Pearlman at 46).

21. On or about February 13, 2009, Plaintiffs formally engaged statistical consulting company Info Tech to provide a damages calculation for the Yariv Action. (Rothstein at 32-33). Info Tech's president, James McClave ("McClave") assigned employee Paul Manning ("Manning") the task of estimating damages. (Stip. 16-19, Jt. Pretrial Order at 5; Rothstein at 32).

22. Plaintiffs notified Harstad of the foregoing by way of a letter dated March 16, 2009. (Def. Ex. 100; Rothstein at 23).

23. By April 2009, Info Tech provided Plaintiffs with charts and an affidavit detailing its damages computation and billed $22,500 in total for its services, which Plaintiffs paid in full. (Stip. 20-22, Jt. Pretrial Order at 5; Rothstein at 36, 38-39).

24. Plaintiffs provided Info Tech with the same data that they provided to Harstad. (Rothstein at 23-24, 36, and 38). The Court is persuaded that Info Tech did not use any of Harstad's pre-October 1, 2008, analysis when computing its final damages number. (See also McClave and Manning testimony, provided to the Court by videotape).

25. Despite agreeing to provide monthly logs in the May 22 letter, Harstad provided Plaintiffs with at most 13 invoices between May 2006 and December 2008. None of the parties, including Harstad, could produce Harstad's first bill, allegedly for May 2006 in the amount of $11,040 plus $583.97 out-of-pocket expenses. (Harstad at 15). Harstad submitted the following invoices to the Court:

   a. June <undated> 2006: $17,040.00 plus expenses of $1,228.60

   b. August 4, 2006: $780.00

   c. January 2, 2007: $8,100.00

    d. May 17, 2007: $1,140.00

    e. June 20, 2007: $4,680.00

    f. December 19, 2007: $10,020.00

    g. March 20, 2008: $7,560.00

    h. July 6, 2008: $35,100.00 plus expenses of $300.00

    i. August 5, 2008: $52,200.00 plus expenses of $1,405.51

    j. October 6, 2008: $32,820.00 plus expenses of $1,140.86

    k. December 21, 2008: $110,700.00 plus expenses of $3,302.92

    l. December 29, 2008: $50,100.00 plus expenses of $450.00

(Def. Ex. 5).

26. These invoices total $349,691.86. (Id.). Harstad has already received $164,604.79 from Plaintiffs. (Harstad at 122). As of October 1, 2013, Harstad claims he is owed $410,109.15, including interest. For comparison, Info Tech completed its calculation for $22,500 and Harstad's maximum estimate of the cost to generate a damages calculation was $21,100.

27. Harstad's invoices, however, reflect several errors. The June 2006 invoice sought payment for 28.4 hours, or $17,040, when the sum of all charges listed on the bill was only 7.3 hours, or $4,380 – leading to a $12,660 overcharge. (Def. Ex. 5; Harstad at 80). Harstad also double-billed 12.6 hours, or $7,560, for the period January-February 2008. (Def. Ex. 5; Harstad at 125). No handwritten or other supplemental records were provided to the Court to substantiate these invoices, which Harstad testified came from his logs on various Post-It notes which he had discarded. (Harstad at 83, 180).

28. The chart supplied by Harstad at trial to show his alleged damages also contained a

number of errors. (Harstad at 88-89, 124-25). Similarly, the chart Harstad provided to Plaintiffs before trial contained several errors. (Harstad at 120-21).

29. In various billing calculations, Harstad unilaterally resumes an interest rate of 1.5%, credits payments against interest outstanding first rather than reducing the principal, compounds interest, and charges interest retroactively before the date of the invoice. (Harstad at 92-106, 189, 193-194, and 107; see also Def. Ex. 5). Harstad further testified that he never spoke with Plaintiffs about how he would calculate interest or how he expected interest to be applied. (Harstad at 131). Indeed, Harstad concedes that on July 10, 2008, Rothstein requested that they address the issue of interest at a later date. (Harstad at 134). Rothstein testified that he thought interest would only be charged on the final third payment, in the amount of .75%, and that he was open to discussion with Harstad on the issue of interest charged on late payments. (Rothstein at 41; see also Harstad at 17). The Court finds Rothstein's testimony credible on this issue.

30. Harstad billed at $600/hour for tasks such as mailing CDs via FedEx, burning CDs, evaluating his own billing errors, and re-organizing his to-do list, contrary to the representation made in his May 22 letter that he would utilize assistants at significantly lower rates whenever feasible. (Def. Ex. 5; cf. Def. Ex. 9).

31. Harstad offered several dramatically different damage estimates to Plaintiffs between June 2008 and December 2008. After a June 6, 2008 estimate of $52,991,926, Harstad proposed a $48,466,241 damages estimate on June 16, 2008. (Def. Ex. 25-26). Finally, after a paralegal in Rothstein's office pointed out that Harstad was multiplying by the wrong column in Excel, Harstad arrived at a revised damages estimate of $12,797,000.63, approximately $40 million off of his original estimate. (Harstad at 146-

47, 150). Harstad did not reduce his billings for the time spent correcting his mistake or the time spent calculating these inaccurate figures. (Harstad at 148-49).

### III. CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

2. Venue properly lies in this judicial district. 28 U.S.C. § 1391(a)(2).

3. The parties have consented to my jurisdiction. 28 U.S.C. § 636(c).

4. The alleged actions at issue in this case occurred in the course of Defendant's work for a New Jersey class action proceeding. Therefore, this Court applies New Jersey law to resolve the matter.

5. Plaintiffs seek a declaratory judgment that they do not owe Harstad any additional compensation for services rendered in the Yariv Action.

6. As to his counterclaims, Harstad bears the burden of proving that Plaintiffs breached their contract and were unjustly enriched by his work product.

7. To establish a breach of contract claim, Harstad must show that there is "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." Ayala v. Assured Lending Corp., 804 F. Supp. 2d 273, 279 (D.N.J. 2011) (citing Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007)).

8. The overwhelming evidence at trial suggests that the parties had an agreement for Harstad to compute a damages estimate for the Yariv Action at a rate of $600/hour while keeping the costs of the task "reasonable" and around an estimated $17,500-$21,100.

9. Harstad's claim that the Plaintiffs breached the contract is barred under the doctrines of

election of remedies. His demand that Plaintiffs not use his work operated as an offer of rescission of his agreement with the Plaintiffs – an offer which the Plaintiffs accepted. "Rescission and damages are alternative remedies," and a party can only elect one. <u>Fablok Mills, Inc. v. Cocker Mach & Foundry Co.</u>, 125 N.J. Super. 251, 260 (App. Div. 1973).

10. "[W]here there exists an election between inconsistent remedies, such for example as the choice between affirming or disaffirming and rescinding a contract, the party, in the absence of transcending equities, is confined to the remedy which he first prefers and adopts." <u>Lizak v. Rottenbucher</u>, 53 A.2d 362, 366 (N.J. Ch. 1947). If a party elects to cancel a contract, he cannot later bring a suit for specific performance of the contract nor may he "recant." <u>B. Holding Co. v. Dubois</u>, 136 A. 518, 519 (N.J. Ch. 1927). Further, an election need not wait for a lawsuit; "letters from the injured party to the wrongdoer" suffice as substantiating what a party elects. <u>Levy v. Mass. Acc. Co.</u>, 2 A.2d 241, 348 (N.J. Ch. 1938).

11. Here, in his January 24, 2009, letter, Harstad offered to rescind the contract, which the Plaintiffs accepted. At this time, the contract had not been fully performed. This is the remedy Harstad first preferred and adopted, before pursuing damages at trial, and "to that election [he] is bound." <u>B. Holding Co.</u>, 136 A. at 519. Harstad had the option of allowing Plaintiffs to use his work and to sue in damages for his fees, or to deny use of his work (as he did) and forego his right to a damages claim. By electing the latter, Harstad is barred from pursuing a breach of contract claim against Plaintiffs.

12. Harstad also cannot recover for breach of contract under the unclean hands doctrine. Harstad violated the covenant of good faith and fair dealing, which is implied in every

contract in New Jersey. <u>Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.</u>, 182 N.J. 210, 224-25 (2005). The covenant "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." <u>Id.</u> (quoting <u>Restatement (Second) of Contracts</u> § 205 comment (a)). "[A] party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J. 236, 244 (2001).

13. Based upon Harstad's representations, Plaintiffs' "justified expectations" were that Harstad' calculation would cost $15,000-$18,000, Harstad would keep costs reasonable, and Harstad would use undergraduate and graduate students when possible to keep costs low. <u>Brunswick Hills</u>, 182 N.J. Super. at 224-25. Even with proposed additions to the cost of $2,500-$3,100, Harstad's maximum estimate was $21,100. Nonetheless, Harstad billed almost ten times this amount in the two disputed December 2008 bills alone and never gave Plaintiffs any indication that he exceeded his estimate. Harstad billed Plaintiffs at $600/hour for work that his assistants could have completed for $15 an hour, including mailing or burning CDs. Further, Harstad remained silent on the astronomically high amounts of billings he was accruing. After promising in his May 22 letter to provide monthly logs, Harstad produced only thirteen haphazard invoices in the approximately twenty-eight months he was retained by the Plaintiffs. Harstad had numerous opportunities to update Plaintiffs, and indeed should have. "The court will refuse its aid to one who remains silent when duty, candor, and fair dealing require him to speak out." <u>Sun Dredging & Constr. Co. v. Ottens</u>, 84 N.J.L. 740, 745 (N.J. 1913). Harstad did not provide Plaintiffs monthly updates, as promised, let alone as

circumstances changed.  By remaining silent in October and November 2008, Harstad breached his duty of good faith and fair dealing.

14. Harstad also failed to perform his own contractual obligations, which a necessary element of a breach of contract claim.  <u>Ayala</u>, 804 F. Supp. 2d at 279.  In demanding that Plaintiffs not use his work, Harstad breached his contract by failing to deliver what he promised – a defensible damages estimate.  Additionally, Harstad's damages calculations were plagued with his own mathematical errors, the corrections of which led to duplicative billing and an initial overstatement of damages by almost $40 million.  Such a calculation would not have been defensible even if Harstad authorized Plaintiffs to use it.  Additionally, Harstad breached his obligations to keep expenses "reasonable," use support staff when possible, and submit monthly bills.

15. Utilizing the same data as Harstad, Info Tech produced a damages estimate for $22,500 – a figure far closer to the estimated cost that Harstad originally provided.  This suggests that the work could indeed have been done for a substantially smaller sum.

16. To prevail on a claim for unjust enrichment, Harstad must "show both that [Plaintiffs] received a benefit and that retention of that benefit without payment would be unjust." <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (1994).

17. To demonstrate injustice, Harstad must "show that it expected renumeration from [Plaintiffs] at the time it performed or conferred a benefit on [Plaintiffs] and that the failure of remuneration enriched [Plaintiffs] beyond [their] contractual rights."  <u>Id.</u>

18. Harstad's unjust enrichment claim fails.  Harstad forbade Plaintiffs from using any of the work he produced after October 1, 2008 unless they agreed to pay him in full for the disputed bills.  Plaintiffs thus retained another expert to perform the damages calculation

      that Harstad was hired to compute. As Info Tech did not use any of Harstad's calculations in their computation, Harstad did not confer a benefit on Plaintiffs.

19. Even if this Court were to find that Harstad were due interest charges, the interest would total significantly less than the amount Harstad has already been paid for time billed when he was making mistakes at Plaintiffs' expense. Harstad's final damages calculation, reached only with the help of Rothstein's paralegal, was a value Plaintiffs could not, and did not, even use. Harstad was handsomely compensated for his class certification assistance and any purported clarifications his pre-October 1, 2008 data analysis was able to provide for the <u>Yariv</u> Action.

20. Since this Court finds that Harstad is not entitled to damages under either his breach of contract or his unjust enrichment claims, the Court does not reach the issue of calculating Harstad's damages.

21. This Court is thoroughly convinced that no amount is due to Defendant Harstad.

## IV.   CONCLUSION

      For the foregoing reasons, a judgment in favor of Plaintiffs, Paul Rothstein, Cohn Lifland Pearlman Herman & Knopf LLP, and Trief and Olk shall be entered. A Form of Order consistent with these Findings of Fact and Conclusions of Law shall issue.

**Dated: September 30, 2014**                <u>*/s Madeline Cox Arleo*</u>
                                                **United States Magistrate Judge**